**Exhibit 1**

**Selected Transcript of "Yellow Julie" Polemics Report podcast (https://youtu.be/ow9Z88FEZLA?si=Cht4fClCd9eG1jKA) covering material referenced in Major Usher Investigation :**

(3:46) (JD Hall) I have with me my producer and co-host from the Denver headquarters - the Denver studio of Pulpit and Pen. His name is… uh, something Lieutenant Colonel General. Something… He is… he's… he is in the Army now. David Morrill. What are you David? Are you like, an E-5 or something?

(4:11) (David Morrill) E-7, Sergeant First Class. I… I actually work for a living, it's a little different.

(4:15) (JD Hall) Yeah. And also… also a business proprietor, as well as, as well as working for the Army National Guard. Thank you for your service. David, we appreciate… thank you for your service, David, we appreciate that. And… also if you could… kill some Russians if you get half a chance.

(4:35-22:37) Continued discussion.

(22:38) (JD Hall) The reason why these fake hate crimes exist is because the demand for hate exceeds the supply. And the same thing goes for sex abuse in the SBC (Southern Baptist Convention), so far as the task force (Southern Baptist Convention Sex Abuse Task Force) is concerned. So like, you know, you have David Sills, who very wrongly - and we should be concerned for his soul - had a 12-year long affair with a 26-year-old who, by the time the affair was over, was nowhere close to 26. The Baptist Press comes out and says, "we're sorry for saying it was consensual." Why is it not consensual? She's 26. A 20-year-old, 21-year-old girl is a woman by that point. She knows what she's doing. All right. It's - it's very consensual. But why remove that? It's because the demand for sexism and for misogyny exceeds the supply. So they have to make it up.

(23:40) (David Morrill) This is what they did with the police who were involved with George Floyd as well. There was no evidence from that at all that race was a factor. But because the because the, you know, victim if you want to call him that was black and there were white officers… There were actually mostly multicultural officers involved but because of…

(24:03) (JD Hall) Yeah, Floyd was a victim. He victimized himself. Anytime you dope yourself up with fentanyl and kill yourself, and then and then act unruly.. then yeah, he's a victim. He's a self-victim just like a suicide. I hate the term "suicide victim." It's a super… you're a "suicide perpetrator," you're not a victim. You're… If I was King tomorrow.. suicide.. people who commit suicide wouldn't even be allowed to have a funeral,but… Yeah, he was…he was a victim of himself. And every time there's a "hands up, don't shoot" fraud committed upon the American people, we're overlooking legitimate cases of police brutality, like with Philando Castile or Ashli Babbitt.

(24:52-27:30) Continued conversation.

(27:31) (JD Hall) Kamala Harris slept her… Kamala Harris slept her way to the top of the Vice Presidency. No, like, where are all the "me too" gals on that one?

(27:42) (David Morrill) She is so, so stupid. I can't believe how stupid she is. I mean, this is a lawyer, right? She's a lawyer. She supposedly speaks for a living, and she's a US Senator. And she's… she's… it's like she's trying to be dumber than Joe Biden.

(27:58) (JD Hall) I've listened to some of her talks on the Ukraine and was like, "Do you know where you're at right now?" Like we ought to pull the 26th Amendment on her, not him - or the 20, 25th. On her more than him.

(28:14) (David Morrill) Yeah, is she trying to see how much the country will tolerate because of her skin color? I'm curious. It's just like, "Well, I know… I know I'm not a dumb, dumb blonde bimbo, but I can try. So let me get in this press conference with some European leaders and just sort of giggle my way through it…"

**Exhibit 1**

(28:30) (JD Hall) She's two chromosomes away from dumb blonde bimbo.

(28:34) (David Morrill) Oh my gosh, she's so dumb.

(28:38) (JD Hall) What else are we gonna talk about besides dumb people?

(28:40-35:51) Continued conversation.

(35:52) (David Morrill) …but I did find it funny that Julie Roys had - and I don't know if you saw this while you were fighting your fights recently - she had none other than Kyle J. Howard on a podcast to talk about racial "twauma."

(36:04) (JD Hall) I didn't catch the podcast, but I caught that he was on her program talking about "wacial twauma."

(36:10) (David Morrill) It was hilarious.

(36:12) (JD Hall) Did you listen to the podcast?

(36:13) (David Morrill) listened to it as long… but I couldn't stop laughing and so I just turned it off. He's like a…

(36:22) (JD Hall) There's not a single one of his stories…think about it this way. I have never heard one of his stories of racial trauma that have even come close to the realm of substantiated. It is all anecdotal. There is no evidence for any of it. And this is the woman who's giving credence to a 20-year-old controversy at Grace Community Church,

(36:46) Right. I mean, I don't think she really understands among logical thinking evangelicals that do any sort of research at all, how much that damages her credibility. She's gonna have Kyle J. Howard on to talk about "wacial twuama" before she goes after John MacArthur. It's like you couldn't write something more ridiculous.

(37:07-56:52) Continued conversation.

(56:53) (JD Hall) I'd pay for a cage fight between Janet Mefferd and Julia Roys. Julie Roys is like the bizarro world evil spawn of Janet Mefferd. And, to this day, Janet Mefferd is the only woman I've ever tangled with in my life that I regretted. She whooped my butt. Bad. And I deserved it. She was right, I was wrong. She won, I lost. And we developed a friendship over the years because, you know, I've been able to recognize that and apologize for it. And Janet Mefferd would rip Julie Roys into… You remember this show on MTV when we were in college…

(57:36) (David Morrill) Yeah, Celebrity Death Match, of course. "Let's get it on!"

(57:41) (JD Hall) Yeah, that would end that would that would be a celebrity deathmatch between those two women and Mefferd would just rip her in two and then… just floss her teeth with her spinal column.

(57:51) (David Morrill) Like it makes me want to learn Claymation just so I can make that happen. (laughs) I'd be pretty good.

(57:59) (JD Hall) Yes. If you can put out that video…

(58:00) (David Morrill) we can have Kyle J. Howard versus Jussie Smollett, you know. Like, who's the biggest proponent of "twauma."

(58:10-1:12:17) Continued conversation.

END TRANSCRIPT

# FW: Comment from Colorado National Guard PUBLIC Website form (UNCLASSIFIED)

VonNida, Joseph Kyle SSG USARMY NG COARNG (USA) <joseph.k.vonnida.mil@army.mil>
Tue 3/15/2022 13:08

To: Massey, Russell A CW3 USARMY NG COARNG (USA) <russell.a.massey.mil@army.mil>
Cc: Byrnes, Jason T 1SG USARMY NG COARNG (USA) <jason.t.byrnes.mil@army.mil>;O'Bryan, Elena K CIV NG COANG (USA) <elena.obryan.3@us.af.mil>

1 attachments (163 KB)
20210819 - CONG Disclaimer Guidance Memo TAG Signed.pdf;

CLASSIFICATION: UNCLASSIFIED

Chief,

According to global this soldier belongs to you. Please let him know that per the attached guidance his broadcast must include a disclaimer as it mentions his military affiliation. This applies to any past or future broadcasts that mention military affiliation but not necessarily the channel itself unless the military affiliation is mentioned in the channel description.

Thank you,

SSG VonNdia

**From:** noreply@dma.mil <noreply@dma.mil>
**Sent:** Monday, March 14, 2022 7:12 PM
**To:** ng.co.coarng.list.militarysupport@mail.mil
**Subject:** Comment from Colorado National Guard PUBLIC Website form

**Name - First, Last Name:** Todd Wilhelm

**Email Address:** tlwdxb@protonmail.com

**Please share your comments with us:**

Dear Ma'am or Sir;
I have recently viewed a YouTube video which involved David Morrill. Morrill is the producer and co-host of the program. Morrill stated that he is a Sergeant 1st Class in the Army National Guard of Colorado. He resides in the Denver area.

It's my opinion that this video contains blatant actions that are in violation of the UCMJ Article 88 - Contempt Toward Officials and UCMJ and Article 133 - Conduct Unbecoming an Officer and Gentleman.

The YouTube video can be found at this link:
https://youtu.be/ow9Z88FEZLA

David Morrill is introduced at the 3:45 mark.

David Morrill speaks very disparagingly of Kamala Harris, our Vice President at the 27:33 - 28:37 mark.

David Morrill states the the George Floyd murder was not racist at the

23:40 - 24:10 mark.

David Morrill makes fun of a black man with a speech impediment for saying "racial twauma" at the 36:00 - 36:58 and again at 58:00 -58:20

Please contact me if you have any questions.

---------------------------

HTTP_CMS_CLIENT_IP:
HTTP_X_ARR_LOG_ID: 50561829-da31-4734-994d-6ff7251d942d
HTTP_ORIGIN: https://co.ng.mil
HTTP_TRUE_CLIENT_IP: 199.66.171.43

CLASSIFICATION: UNCLASSIFIED

12/8/22, 2:26 PM Julie Roys or J.D. Hall & David Morrill: Who Are You Going to Trust? | The Wartburg Watch 2022

# The Wartburg Watch 2022

*Dissecting Christian Trends*

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it

Ok

https://thewartburgwatch.com/2022/03/16/julie-roys-or-j-d-hall-david-morrill-who-are-you-going-to-trust/ 1/21

## Julie Roys or J.D. Hall & David Morrill: Who Are You Going to Trust?

Posted on Wed Mar 16, 2022 by Todd Wilhelm 

I recommend everyone read Julie Roys' article, "EXCLUSIVE: John MacArthur Shamed, Excommunicated Mother for Refusing to Take Back Child Abuser" as background for my article below.

> *"Great things are accomplished through the little ones, the weak ones, the vulnerable ones. When those cries for seeking, saving, protecting, and refuge are heard and honored, then our enemy is silenced. What power the voices of the little ones have if we heed their cries! When we silence the cries of the vulnerable ones (child or adult), we are not protecting God's house. In fact, we are desecrating it, amplifying the voice of the enemy in the house of our God. When we follow our Lord, we bring his redemptive power to bear, not only in the lives of victims but also in our own. God takes the sins against the vulnerable and uses their cries to call us to transformation into his likeness. I know, for he has used the battered, broken lives of many victims to do his redemptive work in me. They have been his gift to me.*
>
> *Jesus drove out those who took what was not theirs, those who made his temple unholy. He then welcomed the little ones and the weak ones, those who establish strength against God's enemies and silence his foe. How then can we, the people of God, silence the little ones and the weak ones when they speak out and say, "Save us now"? We thwart God's redemptive work in his people and in this world when we protect our institutions and titles and positions rather than the vulnerable.*
>
> *May the body of Christ be bold in driving out unrighteousness and welcoming the vulnerable ones, thereby establishing power against God's enemies and silencing his foes. May we go with love and truth into the dens of robbers, no matter where we find them, be they in our pews and communities or in our pulpits, and transform them into places filled with the glory of our great God, who became vulnerable for us."*
>
> *"Redeeming Power: Understanding Authority and Abuse in the Church" by Diane Langberg, page 142.*

Baptist Pastor, J.D. Hall and his producer/co-host, David Morrill, have published a podcast/video in response to Julie Roys' article linked above. In this video Hall and Morrill attempt to defend John MacArthur and discredit Roys, labeling her a yellow journalist, among other things.

Not only do they attack Roys, but they also claim George Floyd committed suicide, and mock Kyle J. Howard's pronunciation of the word "trauma." (I am told Howard has a speech impediment.) This behavior is something you might expect to encounter among some immature boys in middle school, but not in adult men who call themselves Christians. Sadly however, this behavior seems to be on the increase in some patriarchal groups of white Christian males.

[Note from editor: on 7/16/2022 I received word from Kyle J. Howard that he does not have a speech impediment. My sincere apologies to Mr. Howard. I should have went to the source and verified this information. See screenshot below.]

**Kyle J. Howard** @KyleJamesHoward · 34m
Replying to @ThouArtTheMan and @wartwatch
Thanks for this @ThouArtTheMan, tho I would add, not sure who told you I have a speech impediment but I don't. I do have a strong Bronx NY/Jamaican accent. People, esp White Southerners, have made fun of my accent, & how I pronounce "R" sound, but I don't have an impediment.

> *"I couldn't help but think of the question I hear over and over: "Why don't victims report?" I wished every person who asked would put themselves in the victims' place. Into the witness seat where they had to relive their horror in front of an abuser who reveled in the details. Into the police station where they had to tell anyone who asked exactly what happened. Into the stirrups for a rape kit exam where the violation they suffered and the parts they wanted to hide were on full display, touched and photographed. And then, much of the time, the kit ended up buried in the back of a police station. Victims also had to face officers who asked what they'd been wearing. Or a prosecutor who just couldn't be bothered. Or a judge who wouldn't take the simplest steps to protect them. Why don't victims report? Because most of the time, the only thing reporting accomplishes is heightening the trauma to almost unbearable levels. It invites an audience to view your sexual assault. It's choosing to have no voice in the process after having it stolen from you. That's why victims don't report."*
>
> *"What is a Girl Worth: My story of breaking the silence and exposing the truth about Larry Nasser and USA Gymnastics" by Rachael Denhollander, page 362*

Below are some clips from "Yellow Julie," the YouTube video published by Hall and Morrill. I will make some comments after each clip.

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

Julie Roys article which they are discussing.
down MacArthur by digging up dirt on the poor

As highlighted above in the Rachael Denhollander quote, many abuse victims do not want to ever talk about what happened to them. Others may not talk for years, for a number of complex reasons. This is why many States have discarded Statute of Limitations laws on sexual abuse crimes. In Roys' article, she gives us the reason she is writing this article 20 years after the abuse occurred:

> *"In the months between her shamings, GCC members and staff repeatedly harassed and visited Eileen at home, urging her to obey the elders, according to Eileen and dozens of pages of court documents obtained by The Roys Report.*
>
> *For all this time, Eileen has remained silent about her ordeal out of concern for her minor children. She added that she feared backlash from Christians in her community, who revere MacArthur and GCC.*
>
> *But now, Eileen's children are adults. And for the sake of vulnerable women and children at GCC—and at the many churches and institutions influenced by MacArthur—she's speaking now.*

Abuse is abuse no matter if it occurred yesterday or 20 years ago. It needs to be reported to Law Enforcement and the abusers and those who have enabled them need to be named. Eileen spoke up "for the sake of vulnerable women and children." She has done a brave thing. She has done the right thing.

As Charles L. Bailey, Jr. stated in the book he authored, titled "In the Shadow of the Cross: The True Account of My Childhood Sexual and Ritual Abuse at the Hands of a Roman Catholic Priest:"

> *"These people, these evil beings dressed in priestly garb, are not men of God. They deserve no respect, no reverence, no tolerance.*
>
> *We must come forward and expose these priests. Until we make them known, the clerical abuse continues.*
>
> *It takes time - a lot of time. It is now forty-four years since my abuse started. Time heals all wounds? Baloney. The abuse has left permanent scars on us, scars deep into our souls.*
>
> *We need to come forward, to tell our accounts of the abuse we suffered. Remaining silent keeps our children and grandchildren at risk. It is too late for us who are now adults, but we must save the young."*

Do you know who else attempted to minimize sexual abuse that was covered-up because it happened long, long ago? If you said Sovereign Grace Churches, you would be correct.

We use cookies to ensure that we give you the best ... continue to use this site we will assume that you are happy with it.

Ok

**A Response to Allegations Against Sovereign Grace Churches**
**February 13, 2018**

https://static1.squarespace.com/static/5ea1173fc/t/5a8428d/5e/ A Response to Allegations 2-13-18.pdf

**Many have the impression that abuse was widespread throughout Sovereign Grace churches.** This is not true. The lawsuit brought against Sovereign Grace in 2012 included accusations of abuse in two churches that had occurred many years earlier. No other Sovereign Grace churches were named in the lawsuit. While a single incident of abuse is grievous, it is simply false to characterize this as widespread within Sovereign Grace churches, whose experience with this horrible sin is, sadly, not unusual in our culture. We have been grieved to see pastors and church members tainted by this false impression.

**Some accuse Sovereign Grace of conspiring to cover up child abuse.** This, too, is completely false. Some of the details of the civil lawsuit are relevant here:

- The claims of five of the 11 plaintiffs involved cases of *abuse that had been reported and addressed by authorities years earlier.*
- Another five of the plaintiffs made allegations of abuse that were purported to have occurred years earlier. These allegations were sensational and were never confirmed, in spite of investigations by law enforcement and the churches. These resulted in no criminal charges. We strongly believe these allegations to be false.
- In sum, to the best of our knowledge, only one of the confirmed cases of abuse (Morales) relating to the plaintiffs in the civil lawsuit was not reported until years after the abuse occurred.
- The statute of limitations is no mere technicality, but a legal provision that protects people from false accusations made many years after the fact. We believe it served precisely that purpose in the case of allegations in the civil lawsuit that had never before been made and had no corroboration, even if it meant that the merits of the accusations were not fully adjudicated in the context of the suit.

**Some have characterized SGC's experience with abuse as a "scandal" and compared it to horrific instances of modern abuse scandals.** Such characterizations have been uninformed, irresponsible, and have severely damaged the reputations of innocent pastors and churches. They are also false comparisons. At the root of these issues is the case of a convicted pedophile, Nathaniel Morales, who abused victims while a member in one of our churches around 30 years ago. Details of his case are grievous to recount, but they are relevant to the false impression some have of SGC.

- The abuse by Morales occurred in the 1980s at a church that was then part of Sovereign Grace. Morales was not and never has been a pastor or staff *would you like to go to the police? The family member said no, he did not. The other instance was one where a pastor did not have first-hand knowledge of the information of the details—it was 2nd or 3rd hand . . . where the victim didn't discuss the details of what took place until many, many years later.*
- With respect to caring for victims, we readily acknowledge that we have learned much over the last 30+ years. There have been times when we simply did not do it well. We do not believe these instances were common, and they
- C.J. has no recollection of hearing of Morales's crimes in the 1980s. He has

Media error: Format(s) not supported or source(s) not found

mejs.download-file: https://wartburgwatch.com/tww2/wp-content/uploads/2022/03/2022-03-13-Bif-fat-nothing-burger-JD-Hall-on-Roys-article-compressed-1.mp4?_=2

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

Pastor J.D. Hall has revealed his heart and it is cold. David Morrill agrees with Hall, "Yep."

I often read the Gospels and I can confidently say that Christ would never respond in this manner.

David Morrill: "The husband who, I don't think they can verify he was being abusive, was convicted of actual abuse against the children and is now in prison. He was thrown in prison in 2005 and he is still there."

(I believe the "they" who cannot verify that David Gray was being abusive are the GCC Elders, in which case I would have to question their critical reasoning skills, as well as their competency to hold the office of Elder.)

JD Hall: Okay.

David Morrill: So, she's looking back and saying, "well the church didn't report this as they were supposed to," and they didn't believe the wife. Although, as far as I can tell, she may have at least had some, some responsibility...

(Responsibility? Do you mean like reporting it the leaders of her local church? What else could she have done?)

JD Hall: For all we know there were jurors that didn't believe the wife!

(Talk about yellow journalism! Pastor Hall has no factual reason to think there were jurors that didn't believe Eileen Gray, quite the contrary, all the jurors did believe her! How do I know that? Keep reading.)

David Morrill: Right, I mean there were enough that they threw, when she reported it and he was indicted, and I mean, it was enough that he was convicted. I don't know the details of the trial...

JD Hall: Which is like nine out of twelve, but for all we know, there were jurors who didn't, who didn't believe.

(Pastor Hall demonstrates that he knows very little about felony trials.)

"In California criminal cases, a jury trial is where 12 members of the community are assembled to hear the evidence and decide whether or not a defendant is guilty of the crime or crimes with which he or she is charged.

All persons accused of misdemeanors or felonies are entitled to a jury trial. The jurors must **unanimously agree** upon guilt before the defendant can be found guilty and convicted."
Source

Media error: Format(s) not supported or source(s) not found

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.
Ok

rate, honest, and fair. She has presented a
what we don't want you to be as a listener to

Okay, I'm no mind-reader, but I gather that Pastor Hall doesn't want his listeners to be factual truth -tellers that form their opinions on solid evidence. Rather, he seems to prefer people who believe him and his "for all we know" opinions.

Apparently, J.D. Hall and David Morrill want you to follow their example!

Pastor Hall calls Julie Roys a "stinking nut job." That's the kind of pastor that attracts people to Christ - said nobody ever. Hall's tirade continues and I find it all disgusting.

Then Morrill mocks Julie Roys' comment "Hardy has an M.Div. from The Master's Seminary but no professional counseling credentials." Morrill can't seem to comprehend how this fact is relevant. It's fairly obvious to me. Let me continue with Roys' words, which clearly show why the fact that Hardy has no professional counseling credentials was relevant:

> *"During the first counseling session, which included Shannon and Hardy, David admitted he kicked one of the couple's children and tried to suffocate the child.*
>
> *In subsequent counseling sessions, David presented Hardy with a handwritten, four-page list of "sins" against Eileen and his children, Eileen said. On one of these pages obtained by The Roys Report, David admits he used a "belt & rod way too harshly—brutally" on a child. He also says he "tied up" and "locked up" the child and was not always "adequately dressed" in the child's presence.*
>
> *According to Eileen, Hardy refused to take or read David's list.*
>
> *The Roys Report reached out to Shannon and Hardy, specifically asking about these events, but they did not respond.*
>
> *However, in an official court declaration in 2002 concerning Eileen's legal separation from David Gray, Hardy stated: "I am of the opinion that Eileen simply doesn't like David . . . and is using what she alleges to have happened with the children as leverage to put David out of their lives."*
>
> *Hardy accused Eileen in the declaration of having "a tendency to exaggerate" and exercising "faulty logic and irrational thinking."*
>
> *In contrast, Hardy said David Gray was "fairly laid back" and that after several monitored visits between David and his children, "our church concluded that monitors were not necessary."*
>
> *Hardy counseled Eileen to forgive David "even if he wasn't repentant," Eileen testified. "He would teach me over and over 'the threefold promise of forgiveness' . . ." she stated, "where you act as though it never happened, and you never bring it up again, and you never tell anyone about it."*
>
> *Eileen also testified that Hardy urged her to allow David back into the family's home and to model for the children how to "suffer for*

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.
Ok

Changing gears just a bit, did you know that George Floyd committed suicide? Yep, that's what Hall and Morrill claim. You all remember Floyd:

**George** Perry Floyd Jr. (October 14, 1973 - May 25, 2020) was an African-American man who was murdered by a police officer in Minneapolis, Minnesota, during an arrest after a store clerk suspected Floyd may have used a counterfeit twenty-dollar bill, on May 25, 2020. Derek Chauvin, one of four police officers who arrived on the scene, knelt on Floyd's neck and back for 9 minutes and 29 seconds. After his murder, protests against police brutality, especially towards black people, quickly spread across the United States and globally. His dying words, "I can't breathe," became a rallying cry.

The City of Minneapolis settled a wrongful death lawsuit with Floyd's family for $27 million. Chauvin was convicted on two counts of murder and one count of manslaughter on April 20, 2021 and on June 25, 2021, was sentenced to 22.5 years in prison. The other three officers at the scene were also later convicted of violating Floyd's civil rights.
Source

If the kind and compassionate Pastor Hall were King he wouldn't allow a funeral for those who commit suicide!

Were I King I wouldn't allow Pastor Hall to be a Pastor!

Pastor Hall and Morrill are not fans of Kyle J. Howard. Pastor Hall implied above that Howard's entire Twitter feed is made up of false claims of racism. In the clip below Morrill claims Julie Roys has no credibility because she interviewed Kyle J. Howard. They also poke fun at Howard several times in the video for pronouncing "trauma" as "twauma."

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok



**JOINT FORCE HEADQUARTERS - COLORADO**
COLORADO NATIONAL GUARD
6848 SOUTH REVERE PARKWAY
CENTENNIAL, COLORADO 80112-6709

NGCO-TAG                                                          15 September 2021

MEMORANDUM FOR All Colorado National Guard Service Members

SUBJECT:  Use of Disclaimers in Connection with Unofficial News Media Interviews,
Writings, Speeches, Oral Presentations, Political Campaign Materials, and Web and
Social Media Posts

1.  **References:**

    a. Department of Defense Directive 5500.7-R, Joint Ethics Regulation, 17 November
2011

    b. 5 C.F.R. Part 2635

    c. 5 C.F.R. 3601.108

    d. Department of Defense Directive 1344.10, "Political Activities by Members of the
Armed Forces," 19 February 2008

    e. Army Regulation 360-1, "The Army Public Affairs Program," 8 October 2020

    f.  Air Force Instruction 35-101, "Public Affairs Operations," 20 November 2020

    g. National Guard Bureau Memorandum, Social Media Guidance for National Guard
Members, 12 June 14

2. **Purpose.** This memorandum is intended to provide guidance to Colorado National
Guard members regarding the use of disclaimers in connection with unofficial news
media interviews, writings, speeches, oral presentations, political campaign materials,
and web and social media posts. This memorandum does not displace any law,
regulation, or policy. This memorandum also does not address any limitations
concerning the content of any unofficial news media interviews, writings, speeches, oral
presentations, political campaign materials, or web and social media posts including the
need to obtain preclearance where required.

3. **Writings, speeches, or oral presentations.** A disclaimer is required for any writing,
speech, or oral presentation where a National Guard member identifies their affiliation
with the National Guard, Department of Defense, or its components.

NGCO-TAG
Subject: Use of Disclaimers in Connection with Unofficial News Media Interviews,
Writings, Speeches, Oral Presentations, Political Campaign Materials, and Web and
Social Media Posts

   a. A disclaimer is not required where:

      (1) A National Guard member does not identify their affiliation with the National
Guard, Department of Defense, or its components.

      (2) A National Guard member is authorized to present the official policy of the
National Guard, Department of Defense, or its components in accordance with public
affairs guidance.

   b. Content of disclaimer. The disclaimer must expressly disclaim that the views
expressed do not necessarily represent the views of the Colorado National Guard, the
Department of Defense, or any identified DOD component. It is not sufficient for a
National Guard member to merely proclaim that the views expressed are their own.
Acceptable disclaimer examples.

      (1) "The views expressed are those of the author and do not necessarily
reflect the views of the Colorado National Guard, or the Department of
Defense."

      (2) "The views expressed are those of the author and do not necessarily
reflect the views of the Colorado Army National Guard, U.S. Army, or the
Department of Defense."

      (3) "The views expressed are those of the author and do not necessarily reflect
the views of the Colorado Air National Guard, U.S. Air Force, or the Department of
Defense."

   c. Location of disclaimer.

      (1) For written materials, the disclaimer must be printed or appear in a
reasonably prominent position in the writing or published interview.

      (2) For speeches and other oral presentations, the disclaimer may be given orally
at the beginning of the presentation.

   d. Limitation on use of title or position. National Guard members may only include or
permit the inclusion of their title or position, provided that the title or position is given no

2

NGCO-TAG
Subject: Use of Disclaimers in Connection with Unofficial News Media Interviews,
Writings, Speeches, Oral Presentations, Political Campaign Materials, and Web and
Social Media Posts

more prominence than other significant non-military biographical details. National Guard
members must ensure that they are not using their title or position for private gain.

**4. Political campaign materials.** A disclaimer is required in any political campaign
material that identifies a National Guard member's affiliation with the National Guard,
Department of Defense, or its components (e.g., current or former duties, title, rank,
grade, or position) or contains a photograph of the National Guard member in uniform.

    a. A disclaimer is not required where:

    (1) A National Guard member does not identify their affiliation with the National
Guard, Department of Defense, or its components, provided the campaign material
does not contain a photograph of the National Guard member in uniform.

    b. Location of disclaimer. The disclaimer must be displayed clearly and prominently
in the campaign material.

    c. Content of disclaimer. The disclaimer must expressly disclaim that the military
information and photograph(s) do not imply endorsement by the National Guard, the
Department of Defense, or any identified DOD component (e.g., the U.S. Army if the
author identifies themselves to be part of the Colorado Army National Guard).

    (1) **Acceptable disclaimer example.** "John Doe is a member of the Colorado
Army National Guard. Use of military rank, job titles, and photographs in uniform does
not imply endorsement by the Colorado National Guard, the Department of the Army, or
the Department of Defense."

    d. Limitation on use of military information and depictions in uniform.

    (1) National Guard members may only include or permit the inclusion of military
affiliation on personal web and social media accounts when displayed along with
biographical facts including official photos.

    (2) National Guard members are prohibited from:

    A. Using any visual depiction of themselves in uniform as the primary graphic
representation in any political campaign materials

3

NGCO-TAG
Subject: Use of Disclaimers in Connection with Unofficial News Media Interviews, Writings, Speeches, Oral Presentations, Political Campaign Materials, and Web and Social Media Posts

B. Depicting or allowing themselves to be depicted in uniform in a manner not accurately reflecting their actual performance of duty.

**5. Web and Social media posts.** The above requirements apply equally to web and social media posts. For that reason, National Guard members should use appropriate disclaimers where unofficial web or social media page or postings identify their affiliation with the National Guard, Department of Defense, or its components.

**6. Point of Contact.** For answers to questions regarding use of disclaimers, Colorado National Guard members should contact the Public Affairs Office at (720) 250-1053 and ng.co.coarng.list.staff-pao@mail.mil. For questions regarding ethical standards, permissible and prohibited participation in political activities contact the Legal Office at (720) 250-1031 or by email at ng.co.coarng.mbx.jag-jfhq@mail.mil.

CLELLAN.LAURA.LOU.1078474633 Digitally signed by CLELLAN.LAURA.LOU.1078474633 Date: 2021.09.15 14:03:27 -06'00'

LAURA L. CLELLAN
Brigadier General, COARNG
The Adjutant General

# REPORT OF PROCEEDINGS BY INVESTIGATING OFFICER

Note: Completed forms may contain personally identifiable information and require handling as set forth in AR 340-21.
For use of this form, see AR 15-6; the proponent agency is OTJAG.

*IF MORE SPACE IS REQUIRED IN FILLING OUT ANY PORTION OF THIS FORM, ATTACH ADDITIONAL SHEETS*

## SECTION I - APPOINTMENT

Appointed by COL Charles Beatty
*(Appointing authority)*

on 20220406 *(Date)* *(Attach enclosure 1: Letter of appointment or summary of oral appointment data.) (See para 3-15, AR 15-6.)*

## SECTION II - TIMELINE

1. The *(investigation)* commenced at the Denver Armory *(Place)* at 0800 *(Time)*

on 20220407 *(Date)*

2. The *(investigating officer)* finished gathering/hearing evidence a 1100 *(Time)* on 20220521 *(Date)* and completed findings and recommendations at 1100 *(Time)* on 20220604 *(Date)*

## SECTION III - CHECKLIST FOR PROCEEDINGS

| A. COMPLETE IN ALL CASES | YES | NO[1] | NA[2] |
|---|---|---|---|
| 1. Enclosures *(para 3-13, AR 15-6)* Are the following enclosed and numbered consecutively with Roman numerals: *(Attached in order listed)* | | | |
| *a.* The memorandum of appointment? | ☒ | ☐ | |
| *b.* All other written communications to or from the appointing authority? | ☒ | ☐ | ☐ |
| *c.* Privacy Act Statements *(Certificate, if statement provided orally)?* | ☐ | ☐ | ☒ |
| *d.* Explanation by the investigating officer of any unusual delays, difficulties, irregularities, or other problems encountered *(e.g., absence of material witnesses)?* | ☒ | ☐ | ☐ |
| *e.* Any other significant papers *(other than evidence)* relating to administrative aspects of the investigation? | ☒ | ☐ | ☐ |
| *f.* An Executive Summary, Index of Exhibits, Chronology of the Investigation and lists of all persons interviewed and evidence gathered. *(Complex, serious and/or high profile cases)?* | ☒ | ☐ | ☐ |
| 2. Exhibits *(para 3-14, AR 15-6)* | | | |
| *a.* Are all items offered *(whether or not received)* or considered as evidence individually numbered or lettered as exhibits and attached to this report? | ☒ | ☐ | ☐ |
| *b.* Is an index of all exhibits offered to or considered by investigating officer attached before the first exhibit? | ☒ | ☐ | ☐ |
| *c.* Has the testimony/statement of each witness been recorded verbatim or been reduced to written form and attached as an exhibit? | ☒ | ☐ | ☐ |
| *d.* Are copies, descriptions, or depictions *(if substituted for real or documentary evidence)* properly authenticated and is the location of the original evidence indicated? | ☒ | ☐ | ☐ |
| *e.* Are descriptions or diagrams included of locations visited by the investigating officer *(Appendix C-3, AR 15-6)?* | ☒ | ☐ | ☐ |
| *f.* Is each written stipulation attached as an exhibit and is each oral stipulation either reduced to writing and made an exhibit or recorded? | ☒ | ☐ | ☐ |

FOOTNOTES: 1/ *Explain all negative answers on an attached sheet.*
2/ *Use of the N/A column constitutes a positive representation that the circumstances described in the question did not occur in this investigation.*

**SECTION IV - FINDINGS** *(para 3-10, AR 15-6)*

The *(investigating officer)*, having carefully considered the evidence, finds: *[Each paragraph should be one conclusion based on the evidence gathered during the investigation. These findings should provide answers to each question posed by the appointing authority in the appointment memorandum. The evidence that supports each finding must be cited.]*

JD Hall conducted a one hour and twelve minute podcast entitled Yellow Julie with David Morrill who was introduced at 3:45 in the podcast as the producer and co-host of the Denver studio Pulpit and Pen. This podcast was posted on 11 March 2022 open to the public on YouTube at https://youtu.be/ow9Z88FEZLA and through a $5.95 monthly subscription at www.patreon.com/pulpitandpen/.
In the podcast JD Hall identifies David Morrill as a Soldier in the Army at the 4:09 mark and asked David Morrill to clarify his current rank. David Morrill responded at the 4:11 mark stating he is an E7, SFC. JD Hall subsequently went on to mention, at 4:23, that SFC David Morrill is a member of the Army National Guard. The video has a written disclaimer below the video identifying that "The views expressed are those of the hosts and do not necessarily reflect the views of the Colorado Army National Guard, U.S. Army, or the Department of Defense." The general content of the podcast is discussion of past and current news events presented through the religious beliefs and ideals of the host and co-host.

At the 22:39 mark JD Hall expresses his opinion that there are fake hate crimes, and the reason that they exist is because the demand for them exceeds the supply so they have to make them up. David Morrill then used George Floyd as an example of this at the 23:41 mark stating that "this is what they did with the police who were involved with George Floyd, there was no evidence that race was a factor but because the victim if you want to call him that was black and there were white officers". He went on to say that "there were actually multicultural officers involved". JD Hall then cut in and stated that George Floyd was a victim because he victimized himself by doping himself up and killing himself by taking Fentanyl and acting unruly. David Morrill nodded his head saying yeah in agreement. These comments reflect David Morrill's perception of what happened. Although he is permitted to have this opinion he is is in violation of C.R.S. 28-3.1-549 Cognizance of Disreputable Conduct because the nature of the comments do not align with Army values.

At the 27:35 mark JD Hall states that the Vice President Kamala Harris slept her way to the top, and to this David Morrill laughed and said true. Subsequently at 27:45 David Morrill states that she is "so so stupid, I can't believe how stupid she is, I mean this is a lawyer right... she's a lawyer... she supposedly speaks for a living and she's been a US Senator and it's like she's trying to be dumber than Joe Biden". David Morrill asks rhetorically "Is she trying to see what how much the country will tolerate because of her skin color?" He then changes the inflection of his voice to a mocking manner and says "I know I'm not a dumb blonde bimbo, but I can try so lemme get in this press conference with some European leaders and sort of giggle my way through it." The comments are derogatory toward the Vice President of the United States and in violation of C.R.S. 28-3.1-549 Cognizance of Disreputable Conduct. The comments are also contemptuous against the President of the United States and in violation of C.R.S. 28-3.1-512 Contempt Toward Officials.

At the 35:57 mark David Morrill discusses a podcast, entitled Racial Trauma in the Church, where Julie Roys had Kyle J Howard on to talk about racial trauma. In his explanation of this David Morill makes the pronunciation "racial twama", and upon referencing the podcast located at https://julieroys.com/podcast/racial-trauma-in-the-church/ it is clear that this pronunciation is making a mockery of the way Kyle J Howard, a man of mixed ethnicity, speaks in the interview. David Morrill again mocked Kyle J Howard's pronunciation of trauma at the 58:08 mark. These comments are not in line with the Army values and are in violation of C.R.S. 28-3.1-549 Cognizance of Disreputable Conduct.

On March 14, 2022 the JFHQ-CO Public Affairs Office received an email from a private citizen concerning the content of the video and violation of codes of military justice (exhibit C). SSG VonNida subsequently reached out to SFC Morrill's chain of command on March 15, 2022 supplying a TAG memo requiring the Use of Disclaimers in Connection with Unofficial News Media Interviews, Writings, Speeches, Oral Presentations, Political Campaign Materials, and Web and Social Media Posts (exhibit D). CW4 Massey, the unit Commander, sent the disclaimer form to SFC Morrill on March 16, 2022 and requested he sign a DA4856 (exhibit E). SFC Morrill subsequently signed the DA4856, updated the YouTube video with the exact verbiage within the CONG disclaimer guidance, and ensured it was in a reasonably prominent position for the public to see. The Soldier was never counseled regarding the nature of his comments. SFC Morrill elected not to be questioned about the offense (exhibit F).

The unit conducted Equal Opportunity (EO) training on January 9, 2021 (exhibit G), and there is a 1379 pay report that shows SFC Morrill attended drill that month (exhibit H). The unit also has their EO policy posted in the unit office, and in that policy the Commander expressly communicates that "every Soldier is expected to live by the Army Values and is responsible for creating an environment of respect". The Commander also expresses that "inappropriate remarks, comments, jokes, and harassing actions will not be tolerated" (exhibit I).

**SECTION V - RECOMMENDATIONS** *(para 3-11, AR 15-6)*

In view of the above findings, the *(investigating officer)* recommends: *[Each paragraph should be one recommendation based on the findings in Section IV. Address what actions, if any, should be taken with regard to the individuals involved, the unit leadership, and any steps that can be taken to prevent the occurrence in the future. Recommendations do not need to be adverse or punitive. For example, the investigation results can be used as a training tool.]*

SFC David Morrill did comply with with CONG disclaimer guidance, however that did not absolve him from the public comments he made in violation of C.R.S. 28-3.1-549 Cognizance of Disreputable Conduct and C.R.S. 28-3.1-512 Contempt Toward Officials.  The CONG disclaimer guidance states that it "does not displace any law, regulation, or policy" or "address any limitations concerning the content of any unofficial news media interviews, writings, speeches, oral presentations, political campaign materials, or web and social media posts including the need to obtain pre-clearance where required" (exhibit 2).  Based on this findings, this incident was not fully addressed at the lowest levels.  SFC Morrill should be properly counseled by his unit command team about the content of the video, the violations of C.R.S., and he should be required to remove the video.  It is recommended that the unit Commander administer a non-judicial punishment (NJP) to reduce SFC Morrill in rank and/or require SFC Morrill submit his request to retire.

**SECTION VI - AUTHENTICATION** *(para 3-15, AR 15-6)*

THIS REPORT OF PROCEEDINGS IS COMPLETE AND ACCURATE.

Virginia Usher, MAJ
*(Investigating Officer)*

**SECTION VII - ACTION BY APPROVING AUTHORITY** *(para 2-8, AR 15-6)*

The findings and recommendations of the *(investigating officer)* are:

a) Approved.

b) Approved with the following modifications:

(1) The following findings of fact are added/deleted:

(2) The following findings of fact are modified as follows:

(3) The following recommendations are added/deleted:

(4) The following recommendations are modified as follows:

(5) The action recommended in recommendation ________ has been accomplished by ________

(6) Recommendation(s) ________ is not appropriate for action by this command: however, a copy of this investigation is being furnished to ________ for such action as deemed appropriate.

c) Disapproved.

d) The report is (incomplete), (ambiguous), (erroneous) and/or (specify deficiency) with respect to ________

It is, therefore, hereby returned to the IO for corrective action as follows ________

# NON JUDICIAL PUNISHMENT WORKSHEET

**Part I: Notification**

| 1. NAME OF SOLDIER (OFFENDER) | GRADE | SSN | ORGN/MAJOR COMMAND |
|---|---|---|---|
| David J Morrill | E7 | 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 | 89th Troop Command |

2. OFFENSE (S), CITING ARTICLE OF CCMJ AND DATE:

11March2022: Cognizance of Disreputable Conduct, C.R.S. 28-3.1-549; Contempt Toward Officials, C.R.S. 28-3.1-512

3. DATE AND NAME OF JAG WITH WHOM I DISCUSSED THIS ISSUE:
06August2022, CPT Maury Birdwell

4. DATE THIS NOTIFICATION WAS GIVEN: 6 Aug 2022

| 5. ON THE DATE IN ITEM 3, THE INDIVIDUAL NAMED IN ITEM 1 APPEARED BEFORE ME, AND I ADVISED THE SOLDIER OF THE FOLLOWING: | COMMANDER INITIALS BELOW YES | NO |
|---|---|---|
| A. A PRELIMINARY INVESTIGATION DISCLOSED THEY COMMITTED THE OFFENSE(S) IN ITEM 2 ABOVE. | CB | |
| B. I INTEND TO PUNISH THE SOLDIER FOR THE OFFENSE(S) UNLESS THEY GAVE ME SATISFACTORY VERBAL OR WRITTEN EVIDENCE THAT THEY DID NOT COMMIT THE OFFENSE (S), OR GAVE ME A SATISFACTORY EXPLANATION WHICH SHOWED THAT PUNISHMENT SHOULD NOT BE IMPOSED. | CB | |
| C. OF THE MAXIMUM PUNISHMENT I COULD IMPOSE IN THESE PROCEEDINGS. | CB | |
| D. THE SOLDIER DID NOT HAVE TO GIVE ANY INFORMATION OR SAY ANYTHING ABOUT THE OFFENSE (S), AND THAT ANYTHING THE SOLDIER DID SAY MIGHT BE USED FOR OR AGAINST THE SOLDIER IN THIS ACTION OR IN A TRIAL BY COURT MARTIAL. | CB | |
| E. IF THE SOLDIER REQUESTED, MILITARY LEGAL COUNSEL WOULD BE MADE AVAILABLE, FREE OF CHARGE, TO HELP THE SOLDIER DECIDE WHAT TO DO ABOUT PRESENTING MATTERS IN DEFENSE THAT THE SOLDIER ALSO HAS THE RIGHT TO EMPLOY CIVILIAN COUNSEL AT THEIR OWN EXPENSE. | CB | |
| F. THAT ASSISTANCE IN OBTAINING COUNSEL COULD BE OBTAINED BY CONTACTING: ~~SSG Charles Hacker at charles.j.hacker.mil@mail.mil or (513) 416-2360~~ CPT Alla Albana at albana.alla.mil@army.mil 910-638-4035 | CB | |
| G. THE SOLDIER WAS ENTITLED TO AN OPPORTUNITY TO MAKE FULL PRESENTATION IN DEFENSE, MITIGATION, OR EXTENUATION, IN WRITING AND/OR IN PERSON. | CB | |
| H. IF THE SOLDIER DESIRED TO MAKE AN ORAL PRESENTATION, THE SOLDIER MIGHT: (1) CALL WITNESSES WHO WERE AVAILABLE AND COULD BE PRESENTED WITHOUT LEGAL PROCESS (THAT IS WITHOUT SUBPOENA OR PAYMENT OF WITNESS FEES) (2) PRESENT EVIDENCE, AND (3) BE ACCOMPANIED BY A PERSON TO SPEAK ON HIS/HER BEHALF | CB | |
| I. IF THE SOLDIER DOES MAKE A PRESENTATION, WRITTEN OR ORAL, THE FINAL DECISION AS TO WHETHER TO IMPOSE PUNISHMENT AND, IF SO, THE PUNISHMENT TO BE IMPOSED, WOULD BE MADE ONLY AFTER CONSIDERING THE MATTERS PRESENTED. | CB | |
| J. THE SOLDIER WOULD BE ALLOWED 3 DUTY DAYS (OR LONGER IF JUSTIFIED IN WRITING) TO RESPOND TO THIS NOTIFICATION. **THEIR RESPONSE MUST BE RECIEVED NO LATER THAN THE FOLLOWING TIME AND DATE:** 10Sep22 1700 | CB | |

**PART II: IMPOSITION OF NON-JUDICIAL PUNISHMENT**
(TO BE COMPLETED AFTER MEMBER HAS MADE ELECTIONS ON FORM SJAG1A)

| | | |
|---|---|---|
| 6. THE INDIVIDUAL'S DESCISION AS TO WHETHER TO SUBMIT MATTERS IN DEFENSE, EXTENTUATION, OR MITIGATION IS INDICATED BY CHOICE MARKED ON THEIR SJAG1A. | | |
| 7. THE CHECK MARK INDICATES WHETHER THE INDIVIDUAL MADE AN ORAL PRESENTATION IN DEFENSE. ANY WRITTEN STATEMENTS ARE ATTACHED | | |

8. I IMPOSED THE FOLLOWING PUNISHMENT:

**9. DATE OF DECISION:**__________

10. THE INDIVIDUAL ☐ DID ☐ DID NOT APPEAL AT THIS TIME.

(The immediate Commander will forward this form and applicable attachments with appeal.)

| **TYPED NAME AND GRADE OF OFFICER IMPOSING PUNISHMENT:** | **SIGNATURE:** |
|---|---|
| Charles Beatty, O6 | |

# NON JUDICIAL PUNISHMENT - ELECTION OF RIGHTS

| FROM: Soldier Concerned Name, Grade, Unit | TO: Title and Unit of Officer Proposing Punishment |
|---|---|
| David J Morrill, E7, 101st Army Band | COL Charles Beatty, 89th Troop Command |

## PART I: TO BE ACCOMPLISHED PRIOR TO IMPOSITION OF PUNISHMENT

DATE: 20220806

1. You have advised me that you intend to impose punishment upon me under Article 28-3.1-114 of the Colorado Code of Military Justice. You have also advised me:

   a. Of the offenses involved and the maximum punishments you could impose.

   b. I need not make a statement or give information.

   c. If I make a written or oral statement or provide evidence, you will consider this in determining whether it provides a satisfactory explanation or establishes that I did not commit the offense(s), in which case you will not impose punishment.

   d. If I make an oral presentation, I may call witnesses who are available locally and can be presented without legal process. I may present evidence, and I may be accompanied by a person to speak on my behalf.

   e. I have the right to counsel as indicated below.

   f. Of when my reply to your notification is due and that I may request additional time via written justification.

Soldier Initials DJM

2. I understand that, if I request, I am entitled to consult military counsel, free of charge, to advise me on what to do about presenting matters in defense. I understand I may contact military counsel by contacting CPT Alla, Albana at albana.alla.mil@army.mil or (910) 638-4035. I understand that, if I want to consult counsel and have not already done so, you will allow me a reasonable period of time to consult counsel before continuing with this action and will assist me in contacting counsel, if necessary. I understand I have the right to employ civilian counsel at my own expense.

- [X] I do not desire to consult counsel.
- [ ] I have already consulted counsel.
- [ ] I desire to consult military counsel and request a reasonable time to do so before continuing with this action.
- [ ] I desire to employ civilian counsel and request a reasonable time to do so before continuing this action.

Soldier Initials DJM

3. I [ ] waive [X] do not waive my right to 3 duty days to respond.

Soldier Initials DJM

4. I understand that if I elect to make a presentation or consult counsel, or both, you will not make a final decision as to whether to impose punishment and, if so the punishment to be imposed until you have considered the results of those matters.

Soldier Initials DJM

| NAME AND GRADE OF SOLDIER: | SIGNATURE: |
|---|---|
| David J Morrill, E7 | DATE: 20220806 |

## PART II – TO BE ACCOMPLISHED AFTER THE OFFENDER HAS BEEN NOTIFIED OF THE RIGHT TO APPEAL

I have been advised of my right to appeal in accordance with the Colorado Code of Military Justice, paragraph 28-3.1-214(5).

Soldier Initials: DJM

I [ ] do [ ] do not appeal at this time.

Soldier Initials:

| NAME AND GRADE OF SOLDIER: | SIGNATURE: |
|---|---|
| David J Morrill, E7 | DATE: |



**DEPARTMENT OF THE ARMY**
101ST ARMY BAND
660 S ASPEN STREET, #66
BUCKLEY SPACE FORCE BASE, COLORADO 80011-9564

NGCO-101                                                    9 September 2022

MEMORANDUM THRU Office of the Staff Judge Advocate, 6848 Revere Boulevard, Centennial, Colorado 80112

FOR COL Charles Beatty, Commander, 89th Troop Command, 5275 Franklin Street, Denver, Colorado 80216

SUBJECT: Non-Judicial Punishment Response – SFC David Morrill

1. I've written this letter in consultation with legal representation and with the purpose of defending my service record, personal character, and my rights as a citizen-soldier. For all the reasons discussed below, I respectfully request that you withdraw the non-judicial punishment.

2. Before presenting a defense in response to the charges, I would like to speak to my service record and commitment to the Colorado National Guard. I have served honorably in the Colorado National Guard for over 21 years with the same unit with zero disciplinary issues. I am proud of my service and my contribution to the mission of the 101st Army Band and our broader contribution to the mission of the Colorado National Guard. My work as unit Operations Sergeant and online/social media NCO has seen the unit positioned very favorably in terms of our public affairs effectiveness and our public reputation. Over the course of my career, the unit has had zero issues with public imaging/reputation and has presented itself honorably to the public and our fellow soldiers. My commitment to the work we do and the soldiers I serve with has motivated me to reenlist far past my original intentions, and I continue to be proud to serve alongside my fellow CONG soldiers.

## My Work in Online Media

3. Over the last few years, my education, expertise, and professional experience in media has come to encompass work in partisan media (both religious and secular), and this work involves the expression of controversial and contested views. As the online/social media NCO for my unit, my familiarity with the regulatory implications of soldiering in public caused me to recognize the challenges such work might present to my work as a soldier in the CONG. In the interest of not causing difficulty for the CONG (and in the interest of workers who work for my media outlets), I have worked diligently to keep my media work as separate from my military service as possible. My online presence and social media accounts make no mention of my military service. I do not use pictures of myself in uniform in profiles or describe my Army affiliation in social media bios. Even within the investigated video, the discussion never focused on my military affiliation – it was mentioned in an offhanded way and very likely glossed over

by most of the people who watch our niche, religiously-focused content. I merely answered a question I was asked, and quickly moved onto other topics. My media work and income rely heavily on First Amendment protections, and I have studied the applicable laws, military regulations, and legal precedents to make sure I would jeopardize neither my military career nor my work in professional media.

**Discussing and Answering the Charges**

4. As I am facing non-judicial punishment, it would be much easier for me to appeal to my military record, accept whatever punishment is deemed appropriate, and move on promising to try harder to avoid inadvertent connections between my public speech and my military affiliation. Yet absent a strong, comprehensive rebuttal of the conclusions and argumentation employed by the investigation, I (and other Colorado guardsmen) remain susceptible to similar charges in the future. I would be unable to work in journalism/media or my Christian ministry while serving in the military. This leaves me no choice but to answer the charges and explain why I am not guilty of violating the law. To be clear, I am at risk of being punished for exercising my First Amendment rights while off duty and in a civilian capacity. Freedoms enjoyed by every citizen of the United States, are being denied to me not because those freedoms have caused any demonstrable effect on the military environment or mission, but because the leadership of a government agency disagrees with my views.

5. At issue is whether my published speech within the video in question were a violation of C.R.S. 28-3.1-549 *Cognizance of disreputable conduct* (Colorado's "general article") or 28-3.1-512 *Contempt toward officials*. As free speech rights are guaranteed to every citizen of the United States by the First Amendment, and the duty to not abridge those rights falls upon every government agency per the Fourteenth Amendment, deeming the protected speech of an off-duty Guardsman to be *criminal* must begin by answering several fundamental legal questions:

a. Do citizen-soldiers forfeit the basic Constitutional liberties afforded all citizens when they volunteer for military service?

b. If citizen-soldier speech remains protected under the First Amendment, what are the circumstances that might cause this protected speech to become a violation of the law?

c. Are limitations on citizen-soldier speech changed when the soldier is on versus off duty?

6. I recognize the challenge of applying these statutes, as the language of both contains ambiguity and state-level legal precedent is difficult or impossible to find. Fortunately, both statutes (like nearly all the CCMJ) have UCMJ counterparts we can look to for guidance – guidance that is *entirely applicable in cases that implicate the Constitution*.

**The First Amendment trumps both the UCMJ and the CCMJ.**

**Disreputable Conduct**

7. The UCMJ counterpart to C.R.S. 28-3.1-549 *Cognizance of disreputable conduct* is UCMJ Article 134 *Conduct Prejudicial to Good Order and Discipline*, otherwise known as the "general article." In military prosecution, the general article covers an expansive range of conduct and is typically charged in conjunction with other military crimes. C.R.S. 28-3.1-549 contains materially identical clauses to UCMJ Article 134 regarding "disorders and neglects to the prejudice of good order and discipline" and "bringing discredit."

8. In each of the three "general article" offenses described in the investigation, the determination can be summarized as follows: SFC Morrill (on his personal time and in pursuit of his religious journalism) expressed objectionable/offensive/derogatory views in a public forum, these views are deemed to be out of alignment with the Army values, therefore SFC Morrill violated the general article of CCMJ. In other words: Speech claimed to be "offensive" by a hearer – while ordinarily protected under the First Amendment – becomes *criminal* due to SFC Morrill serving in the National Guard. As indicated by the last page of the investigation document, *the presence or lack thereof of a military disclaimer on the video had no bearing on the investigation's determination that the speech in question was criminal.*

9. The United States Court of Appeals for the Armed Forces (CAAF) has provided helpful interpretation of *general article* applications to speech, and in the 2008 case United States v. Wilcox, the court outlined a *two-threshold standard* to determine whether a service member's speech is an offense to the UCMJ (in this case, CCMJ) general article.

The court stated in the majority opinion that (emphasis mine):

> The First Amendment provides that Congress shall make no law abridging the freedom of speech; this protection permits the expression of ideas, **even the expression of ideas the vast majority of society finds offensive or distasteful**; the sweep of this protection is less comprehensive in the military context, given the different character of the military community and mission. …the CAAF has long recognized that when assessing a criminal violation implicating the First Amendment, the proper balance must be struck between the **essential needs of the armed services and the right to speak out as a free American**; necessarily, the CAAF must be sensitive to protection of the principle of free thought; prior to applying this balancing test to a charged violation of Article 134, UCMJ, involving speech, two threshold determinations must be

made: **first, the speech involved must be examined to determine whether it is otherwise protected under the First Amendment**, and second, the government must have proved the elements of an Article 134, UCMJ, offense. For any offense charged under Article 134, UCMJ, clauses 1 or 2, the government must prove: (1) that the accused did a certain act, and (2) that the act was, under the circumstances, to the prejudice of good order and discipline or was of a nature to bring discredit upon the armed forces; in the context of the First Amendment, in order to meet the second element for conduct charged under a prejudice of good order and discipline theory, **the prosecution must show a reasonably direct and palpable connection between an appellant's statements and the military mission; a direct and palpable connectibetween speech and the military mission or military environment is also required for an Article 134, UCMJ, offense charged under a service discrediting theory**. If an accused's speech is otherwise protected by the First Amendment, and if a reasonably direct and palpable connection between the speech and the military mission or military environment is established, only then need an appellate court determine whether criminalization of that speech is justified despite First Amendment concerns; ultimately, **an appellate court must weigh the gravity of the effect of the speech, discounted by the improbability of its effectiveness on the audience the speaker sought to reach**, to determine whether the conviction is warranted; **where the record does not establish a reasonably direct and palpable connection between the speech and the military at all, let alone the military mission or military environment, the balancing test is mooted by the legal insufficiency of the charged offense**.

10. To summarize, the United States Court of Appeals for the Armed Forces has determined that ***the speech itself* must have a direct and palpable (easily perceived) connection to the military mission or environment**, and in cases where the *speech* in question does not have a connection to the military *at all*, the charged offense is so insufficient that it does not warrant further examination by the two-threshold test. As the court is clearly discussing the free speech of *military members*, the question of whether the speaker is identifiable as a member of the armed forces is moot - it can be assumed the speaker's military affiliation is known. In fact, nowhere in the UCMJ or CCMJ is there a legal distinction made between the speech of a "known" service member versus an "unknown" service member.

11. This investigation, on the other hand, deemed that a connection between the *speaker* and the military makes *any speech* by a Guard member – on or off duty - a potential violation of the general article – a standard that is a chilling threat to the Constitutional rights of every National Guard member. This confusion is understandable considering the September 2021 CONG disclaimer memo (which clearly misapplies cited statutes), although the investigation specifically does not rely on the memo guidance to judge the speech in question to be illegal. In fact, the investigation (in an attempt to show that the presence of the disclaimer doesn't affect the legality of the speech in question) inadvertently undercuts the validity of the disclaimer memo when it

notes that the memo "does not displace any law, regulation, or policy." The memo's disclaimer requirements are an abridgement of the free speech protections of the Constitution and the memo's cited code (C.F.R. 3601.108) applies to military members "if the subject of the teaching, speaking or writing deals in significant part with any ongoing or announced policy, program or operation of the DoD employee's agency." Thus, the memo would apply to speech from a position of military authority or expertise, not to off-duty, unrelated speech.

11. The speech in question was clearly protected under the First Amendment, clearly not connected in any way to the military mission or environment, and therefore should not be punished under the general article. As made clear by the CAAF, **absent a direct military connection the military has *no compelling interest* that would outweigh First Amendment protections.**

**Contempt Toward Officials**

12. The second charge at issue is C.R.S. 28-3.1-512 *Contempt toward officials.* This statute is derived from UCMJ Article 88 *Contempt toward officials*, although the CCMJ statute applies to both officers and enlisted, and only refers to the President and the Governor. Case law concerning *Contempt toward officials* is almost non-existent in the UCMJ era, as only one service member has faced a court martial for Article 88 since the inception of the UCMJ in 1950.

13. Like the application of the *general article*, there are two thresholds that must be met to establish a charge of *Contempt* under CCMJ. First, it must be determined if the statement in question meets the plainly understood definition of *contemptuous*. Second, if the statement is contemptuous (and in consideration of the context and intended audience), it must potentially "detrimentally affect the morale or effectiveness of any unit of the state military forces" (Clause 2 of C.R.S. 28-3.1-512) when accounting for the gravity of the speech and effectiveness on the audience it was seeking to reach (CAAF guidance on military connections in free speech).

14. The statement in question was, "it's like she's trying to be dumber than Joe Biden." While one might erroneously assume the statement is expressing a view concerning President Joe Biden, the statement reaches no objective conclusion about the President – positive or negative. No statement is made about the President's relative intelligence, and the statement is valid irrespective of President Biden's intellectual capabilities. Even if it is assumed that the statement is contemptuous of the President, it must be demonstrated that the statement may "detrimentally affect the morale or effectiveness of any unit of the state military forces." Here we can similarly apply the Appeals Court (CAAF) guidance of military connection and ask, **does the statement (the speech, not the speaker) have a direct and palpable (easily perceived) connection to the military mission or environment?** This connection would be necessary for a simple and common political opinion to affect military morale or unit effectiveness. A service member speaking in civilian clothes, off duty, and in a forum entirely separate from anything related to the military manifestly fails both clauses of the applied statute.

SUBJECT: Non-Judicial Punishment Response – SFC David Morrill

**Effect of the Speech and Audience**

15.In consideration of the CAAF's standard of determining the effect of the speech in question **discounted by the improbability of its effectiveness on the audience the speaker sought to reach,** the video analytics show that only 30% of the video's audience watched long enough to hear the reference to the President, meaning less than 500 people (or 0.008% of Coloradoans) heard the remark. Instead, the "anonymous" complaint was sent by Todd Wilhelm, a writer for an opposition religious website called *The Wartburg Watch* who has targeted me in the past with derision and attacks. In fact, two days after complaining about the video to CONG PAO, Mr. Wilhelm wrote an article in which he attacks me in a more detailed manner: https://thewartburgwatch.com/2022/03/16/julie-roys-or-j-d-hall-david-morrill-who-are-you-going-to-trust/
If you read the article above, it will be clear that not only is it the same person who sent the email to PAO, but that his motive has nothing to do with "disorders and neglects to the prejudice of good order and discipline in the state military forces," "discredit upon the state military forces," (C.R.S. 28-3.1-549) or anything that would "detrimentally affect the morale or effectiveness of any unit of the state military forces" (28-3.1-512) and everything to do with doing harm to the career of a CONG soldier whom he happens to disagree with theologically.

16. This is relevant because a violation of *Cognizance of Disreputable Conduct* requires action that brings "discredit upon the state military forces," and my reputation with Mr. Wilhelm clearly has nothing to do with his concern for military service and everything to do with his objections to my theological and political views. There is no evidence that the speech in question caused harm to the military or the CONG in any way, and in any case I had no intention on drawing any connection between my media work and my military service.

.

**The Biased and Flawed Application of the Law in the Investigation**

17. The investigation concluded the following about my remarks concerning George Floyd (emphasis mine): "Although he (Morrill) **is permitted to have this opinion** he is in violation of C.R.S. 28-3.1-549 because the nature of the comments do (sic) not align with Army values." The investigation acknowledges that I have freedom of thought, then proceeds to subjectively weigh my thoughts using an extralegal standard. It reaches this conclusion with zero evidence and zero logical application of the statute in question. Rather, it seems to employ a personal standard for which views on current events are acceptable, determined my views are unacceptable, and overbroadly applies the language of the statute to deem expression of these views to be *criminal*. Subjectively applying the Army values as if they are legally actionable in and of themselves is

capricious, arbitrary, and ironic. To be clear, Army values are not punitive, they are merely aspirational in nature.

18. Applying the *general article* to off-duty speech in this manor does profound damage to the Constitutional protections of soldiers, creating a subjective blank check that can be used to punish any non-military speech deemed unacceptable by superiors. For example, if a minister who happens to be a member of the CONG publicly expresses the belief that homosexual marriage is sinful (a belief held by many religions) and a hearer finds the pastor's expression to be offensive, this investigation's unconstitutional application of the general article could similarly find the pastor guilty of a military crime.

19. The investigation applies this same subjective standard to my comments about Kamala Harris and Kyle J. Howard, making the determination that the comments are derogatory or "not in line with Army values," and therefore *criminal*. These determinations show absolutely no consideration for the First Amendment, nor the proper, rights-balancing standard described by the United States Court of Appeals for the Armed Forces.

20. In terms of the allowability of criticizing the President or Governor, it is clear from a multitude of examples that the *context and position from which a soldier speaks* politically is essential to a proper application of the law. The most obvious example within our own ranks is COL George Brauchler, who despite his known military affiliation is routinely and highly critical of Governor Jared Polis – accusing the Governor of corruption, of taking away the rights of Coloradoans, and of causing a crime wave in Colorado.

21. COL Brauchler's criticisms would be interpreted as "contemptuous" towards the Governor under the standard used in this investigation, and (considering COL Brauchler's known Colorado military affiliation) could very well "detrimentally affect the morale or effectiveness of any unit of the state military forces." Certainly, COL Brauchler's detailed and specific criticisms of Jared Polis (in the Denver Post, no less) would be a much greater violation of *Contempt* than my off-handed mention of Joe Biden on a relatively unknown podcast video. Yet COL Brauchler enjoys his unabridged First Amendment rights while I find myself facing punishment. The standard used in this investigation would find COL Brauchler routinely guilty of Contempt for Officials.
In truth, neither myself nor COL Brauchler should face charges for our public speech because the speech cannot be reasonably interpreted as bearing direct connection to the military (again, the CAAF's standard is direct or palpable connection between the *speech itself* and the military mission or environment, not the speaker).

22. To demonstrate with contrasting examples, a National Guard reservist voicing an opinion on George Floyd on his own time has nothing to do with the military, whether hanging out with friends, being overheard at a local bar, or discussing current issues on a podcast video. It would be hard to argue that a soldier – even in uniform and on duty - expressing an opinion on the George Floyd case would involve a direct and palpable

connection to the military. This speech fails to meet any of the thresholds required to become prosecutable under military code.Yet if the same soldier uses his speech to encourage fellow soldiers to disobey orders (even off duty or out of uniform), this speech has a direct and palpable connection to the military mission and environment and would be open to prosecution under clause 1 and 2 of the general article.

**Conclusion**

23. In light of proper interpretation and application of the statutes in question – made unquestioningly clear by the United States Court of Appeals for the Armed Forces – I believe this non-judicial punishment proceeding should be terminated. Simply put, the CCMJ does not overrule the Constitution any more than the UCMJ does - absent the narrow standard of a direct and palpable connection between the speech (again, not the *speaker*) and the military mission or environment.

24. The disregard for the general principles of the First Amendment demonstrated in this investigation "brings discredit upon the state military forces" (C.R.S. 28-3.1-549) by manifestly failing to support and defend the rights all soldiers swear to uphold and defend. The investigation employs overly broad interpretation of the statutory context that minimizes Constitutional rights and enables subjective prosecution of off-duty conduct.

25. As CCMJ apparently does not allow me to decline NJP, the validity of my position and concern for fellow soldiers who may subsequently face similar erroneous charges compels me to commit to standing up for the Constitutional rights of National Guard soldiers. In the absence of a full exoneration and dismissal of these charges, I intend to exercise my right to appeal. Please know that it was not nor is currently my intention to cause difficulty for CONG Public Affairs or my fellow soldiers, but the desire to avoid challenge or inconvenience for the Colorado National Guard does not invalidate the Constitutional rights of its soldiers.

26. My intention going forward (like before) is to exercise my Constitutional rights in a manner that draws as little connection between my ministerial work and my military affiliation as possible - on my own time and my own dime. When called to duty, I intend to be the best soldier I can be and eagerly accept the limitations on personal freedoms that duty requires. Yet I will insist on the unabridged exercise of my Constitutional liberties when not on duty or acting in a military role. I must defend my and others' right to speak freely (even offensively) outside of a military context without fear of reprisal.

DAVID MORRILL
SFC, COARNG
Respondent



**DEPARTMENT OF THE ARMY**
**ARMY NATIONAL GUARD TRIAL DEFENSE SERVICE**
**111 SOUTH GEORGE MASON DRIVE**
**ARLINGTON VA 22204-1373**

ARNG-TDS-FTS

9 September 2022

MEMORANDUM THRU Office of the Staff Judge Advocate, 6848 Revere Boulevard, Centennial, Colorado 80112

FOR COL Charles Beatty, Commander, 89th Troop Command, 5275 Franklin Street, Denver, Colorado 80216

SUBJECT: Motion to Withdraw Non-Judicial Punishment for Lack of Jurisdiction – SFC Morrill, David

1. The brigade commander (CDR), Colonel Charles Beatty intends to administer a non-judicial punishment (NJP) under Colorado Code of Military Justice (CCMJ) against SFC Morrill for statements government has deemed contrary to the Army values. CDR cannot punish SFC Morrill because he lacks jurisdiction to do so. The CCMJ and punitive actions stemming from it only apply to Soldiers in a duty status. Contrary to the law and without jurisdiction, COL Charles Beatty has initiated an NJP under the CCMJ.

2. CDR appointed Major Virginia Usher as an investigating officer (IO), per Army regulation 15-6, to investigate SFC Morrill, specifically statements he made on 11 March 2022, on a public religious podcast. The IO completed her investigation on 4 June 2022. She concluded several statements SFC Morrill made either violated the Army values or CCMJ, specifically C.R.S. 28-3.1-549 Cognizance of Disreputable Conduct and C.R.S. 28-3.1-512 Contempt Toward Officials. On 6 August 2022, the CDR notified SFC Morrill of his intent to punish him for violating the noted sections of the CCMJ.

3. The Colorado code of military justice only applies when the Soldier is in a duty status. C.R.S. 28-3.1-105, Territorial applicability of this code, states, "(1)This code applies to all persons otherwise subject to this code, either in title 32 of the United States Code, as amended, or state active duty status, while they are serving outside the state and while they are going to and returning from such service outside the state in the same manner and to the same extent as if they were serving inside the state." C.R.S. 28-3-101 (13) defines "on duty" as follows, "On duty' includes periods of drill and such other training and service as may be required under state or federal law, or orders." On 11 March 2022, the day SFC Morrill made the statements enumerated above, he was not on title 32 status, not on state active-duty status, not going to and returning from such service, not drilling, or training under no state or federal law, or orders. That day, SFC Morrill was Mr. Morrill, a private citizen, not on duty. Any military justice action based on actions in a non-duty status are legally void.

4. Finally, this NJP is a blatant violation of SFC Morrill's First Amendment right to freedom of speech and religion. The COARNG as evidenced in the IO's report, finds

offensive particular views SFC Morrill expressed in his capacity as a private citizen and now seeks to punish him for those views. This is viewpoint discrimination, an egregious form of content discrimination. "When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rectors and Visitors of the University of Virginia*, 515 U.S. 819, 829 (1995). I implore the CDR to dismiss the NJP and take no further action on this matter. Our organization has suffered enough embarrassment in a recent case involving identical 1st Amendment issues.

5. The point of contact for this memorandum is MAJ Albana Alla, Alla at albana.alla.mil@army.mil or (970) 445-7698.

ALLA.ALBANA.1249460687 Digitally signed by ALLA.ALBANA.1249460687 Date: 2022.09.09 11:17:58 -06'00'

Albana Alla
MAJ, JA
Counsel for Respondent



**DEPARTMENT OF THE ARMY**
COLORADO ARMY NATIONAL GUARD
89TH TROOP COMMAND
5275 FRANKLIN STREET
DENVER, COLORADO 80216

NGCO-TC

3 December 2022

MEMORANDUM FOR SFC David J Morrill, 101st Army Band, 660 S Aspen Street, Buckley Space Force Base, CO 80011

SUBJECT: Letter of Reprimand

1. You are hereby reprimanded. It has been reported to me that despite various counseling and trainings on Military Equal Opportunity Policy, along with years of training as a soldier and non-commissioned officer on the Army Values, you made recorded statements in direct contradiction to those Policies and Values while representing yourself as an Army Soldier.

2. On 11 March 2022, a video and audio recording was publicly posted in which you identified yourself as a Soldier in the Colorado Army National Guard and went on to discuss various social and political topics. In that recording, among other things, you agree with the statement that the Vice President of the United States "slept her way to the top" and state "she's so, so stupid...it's like she's trying to be dumber than Joe Biden." These statements, taken with numerous others, display a deep contempt and disrespect for the two highest ranking members of our chain of command.

3. Additionally, your remarks concerning race as well as mockery of the pronunciation by a man of mixed ethnicity are deeply violative of the letter and spirit of Army Equal Opportunity Policy. The United States Military and the Colorado Army National Guard are places where diversity is respected and people are treated equally without regard to race, color, gender, sexual orientation, religion or national origin. Your comments make it clear that not only do you disagree with this Policy, but also cannot be relied upon to support it.

4. The noncommissioned officer corps is the backbone of the Army. We rely upon NCOs to be leaders, mentors, and entrust them with the well-being of our Soldiers. Your conduct in this matter has caused me to question your integrity, judgment, professionalism and potential to fulfill these solemn duties.

NGCO
SUBJECT: LETTER OF REPRIMAND

5. This reprimand is imposed as part of non-judicial punishment under section 114 the Colorado Code of Military Justice, not as an administrative measure under AR 600-37. It is intended to promptly and directly signal my disapproval of your conduct.

ALYSSA AARHAUS
COL, USA
Commanding

Encls
1. Acknowledgment
2. AR 15-6 Investigation



**DEPARTMENT OF THE ARMY**
101ST ARMY BAND
660 S ASPEN STREET, #66
BUCKLEY SPACE FORCE BASE, COLORADO 80011-9564

NGCO-101                                                          7 December 2022

MEMORANDUM THRU Office of the Staff Judge Advocate, 6848 Revere Boulevard, Centennial, Colorado 80112

FOR Appeal Authority

SUBJECT: Appeal of Non-Judicial Punishment and Letter of Reprimand – SFC David Morrill


1. This memorandum serves notice that I am appealing the decision by COL Aarhaus to impose a non-judicial punishment (NJP) in response to an investigation into my speech from an online video published 11 March 2022.

2. This also serves notice that I am appealing the Letter of Reprimand written by COL Aarhaus as part of the NJP, and object strongly to the conclusions COL Aarhaus has alleged in the letter.

3. The Letter of Reprimand makes the following false claims:

   a. That I "represented myself" as a Soldier. I merely responded to a question I was asked before moving on to religious and political discussion, was not in uniform, not on duty in any capacity, and discussed nothing military-related.

   b. That the Vice President is a "high ranking member of our chain of command." The Vice President is not in the military chain of command. Additionally, I made no objectively qualitative statement about the President of the United States.

   c. That I violated the "letter and spirit of Army Equal Opportunity Policy." Army EO policy is specific to Army employment and the military environment, and the Constitutionally protected speech in question was entirely unrelated to both.

   d. That I made "remarks concerning race as well as mockery of a man of mixed ethnicity" that violated Army EO policy. My opinion that George Floyd was not targeted based on race has nothing to do with Army EO policy, and my statement of this view is Constitutionally protected. I made no mention of the mixed ethnicity of the subject of my mocking criticism – this context was inserted by the military investigator and COL Aarhaus.

SUBJECT: Appeal of Non-Judicial Punishment and Letter of Reprimand – SFC David Morrill

4. Both the NJP and the resulting Letter of Reprimand represent the Colorado National Guard labeling me as a racist, as COL Aarhaus's employing of Army EO policy leaves no other conclusion but that I violated the policy's prohibition against mistreating people based on their race. The conclusions made by the letter are of such a grievous, defamatory, and malicious nature as to do irreparable harm to my ministry, civilian career, and military career. Additionally, this letter has caused and will continue to cause grief and stress for my family.

5. Both the NJP investigation and the Letter of Reprimand presuppose that open-ended language within and discretionary application of the Colorado Code of Military Justice grant subjective, arbitrary, and near-unlimited punitive authority to commanders over Colorado Guard members regardless of duty status or military context. In punishing me and labeling me a racist in her Letter of Reprimand, COL Aarhaus has not only defamed me and caused great emotional toil for myself and my family, but more offensively she subordinated The Constitution of the United States to the lesser law of CCMJ, the unrelated Army EO policy, and the non-binding Army Values – a position antithetical to true commitment to protect and uphold our founding document. These actions represent a callous disregard for principles and supreme legal authority of the Constitution.

6. I implore you as the top military official in the state of Colorado to reverse this egregious decision to punish me in this matter, and mitigate the damage done by the defamatory Letter of Reprimand. I further request that as part of these reversals, the Colorado National Guard provide a letter of apology to my wife and children for the pain and suffering caused by the maligning of my character and service record that has occurred.

DAVID MORRILL
SFC, COARNG
Respondent

HQDA# 5797679

UNCLASSIFIED

# NCO EVALUATION REPORT (SSG-1SG/MSG)

For use of this form, see AR 623-3; the proponent agency is DCS, G-1.

SEE PRIVACY ACT STATEMENT IN AR 623-3

## PART I - ADMINISTRATIVE DATA

| a. NAME (Last, First, Middle Initial) | b. SSN (or DOD ID No.) | c. RANK | d. DATE OF RANK | e. PMOSC |
|---|---|---|---|---|
| MORRILL, DAVID, J | 1245311822 | SFC | 20140916 | 42R4O |

| f. UNIT, ORG, STATION, ZIP CODE OR APO, MAJOR COMMAND | g. STATUS CODE | h. UIC | i. REASON FOR SUBMISSION |
|---|---|---|---|
| 101ST ARMY BAND, BUCKLEY SFB, 800119564, NG | M-DAY | WQKKAA | 02 \| Annual |

| j. PERIOD COVERED FROM (YEAR MONTH DAY) | THRU (YEAR MONTH DAY) | k. RATED MONTHS | l. NONRATED CODES | m. NO OF ENCLOSURES | n. RATED NCO'S EMAIL ADDRESS (.gov or .mil) |
|---|---|---|---|---|---|
| 20211110 | 20221109 | 12 | | 0 | david.j.morrill.mil@army.mil |

## PART II - AUTHENTICATION

| a1. NAME OF RATER (Last, First, Middle Initial) | a2. SSN (or DOD ID No.) | a3. RATER'S SIGNATURE | a4. DATE (YYYYMMDD) |
|---|---|---|---|
| BYRNES, JASON, T | 1110232566 | BYRNES.JASON.THOMAS.1110 Digitally signed by | 20230105 |

| a5. RANK | PMOSC/BRANCH | ORGANIZATION | DUTY ASSIGNMENT | a6. RATER'S EMAIL ADDRESS (.gov or .mil) |
|---|---|---|---|---|
| 1SG | 42R5M | 101ST ARMY BAND | FIRST SERGEANT | jason.t.byrnes.mil@army.mil |

| b1. NAME OF SENIOR RATER (Last, First, Middle Initial) | b2. SSN (or DOD ID No.) | b3. SENIOR RATER'S SIGNATURE | b4. DATE (YYYYMMDD) |
|---|---|---|---|
| MCCALLUM, KELSIE, L | 1388509836 | MCCALLUM.KELSIE.LEIGH.1388 Digitally signed by | 20230106 |

| b5. RANK | PMOSC/BRANCH | ORGANIZATION | DUTY ASSIGNMENT | b6. SENIOR RATER'S EMAIL ADDRESS (.gov or .mil) |
|---|---|---|---|---|
| WO1 | AG | 101st ARMY BAND | COMMANDER | kelsie.l.mccallum.mil@army.mil |

| c1. SUPPLEMENTARY REVIEW REQUIRED? | c2. NAME OF SUPPLEMENTARY REVIEWER (Last, First, Middle Initial) | c3. RANK | PMOSC/BRANCH | ORGANIZATION | DUTY ASSIGNMENT |
|---|---|---|---|---|---|
| [X] YES [ ] NO | THOMPSON, ZACHARY, E | CPT | AG | 193rd MP BATTALION | BATTALION S4 OIC |

| c4. COMMENTS ENCLOSED? | c5. SUPPLEMENTARY REVIEWER'S SIGNATURE | c6. DATE (YYYYMMDD) | c7. SUPPLEMENTARY REVIEWER'S EMAIL ADDRESS (.gov or .mil) |
|---|---|---|---|
| [ ] YES [X] NO | THOMPSON.ZACHARY.EDWARD.13984 Digitally signed by | 20230120 | zachary.e.thompson13.mil@army.mil |

RATED NCO: I understand my signature does not constitute agreement or disagreement with the assessments of the rater and senior rater. I further understand my signature verifies that the administrative data in Part I, the rating officials and counseling dates in Part II, the duty description in Part III, and the APFT and height/weight entries in Part IVa and IVb are correct. I have seen the completed report. I am aware of the appeals process of AR 623-3.

| d1. COUNSELING DATES | INITIAL | LATER | LATER | LATER | d2. RATED NCO'S SIGNATURE | d3. DATE (YYYYMMDD) |
|---|---|---|---|---|---|---|
| | 20220206 | 20220306 | 20220630 | 20221104 | MORRILL.DAVID.JEFFREY.12453 Digitally signed by | 20230119 |

## PART III - DUTY DESCRIPTION (Rater)

| a. PRINCIPAL DUTY TITLE | b. DUTY MOSC |
|---|---|
| OPERATIONS SERGEANT | 42R4O |

c. DAILY DUTIES AND SCOPE (To include, as appropriate, people, equipment, facilities, and dollars)

**Supervises Musical Performance Team C (MPT-C), a 6-Soldier deployable team; NCOIC of the unit's Operations Division, a 11-Soldier team; organizes, instructs, counsels, evaluates, and provides technical support to the junior instrumentalists of the Musical Performance Team; supervises Musical Performance Team operator maintenance; performs duties as music arranger, as required; performs as Sound and A/V technician as required for Concert Band and all Teams; performs lead vocals, keyboard, and trombone in MPT-C; performs vocals in Concert Band and on trombone in Marching Band and Jazz Ensemble.**

d. AREAS OF SPECIAL EMPHASIS

**Denver Veteran's Day Festival; COARNG Change of Command Ceremony; Operational Readiness Evaluation; Annual Summer Tour; Windsor 4th of July Celebration; Union Colony Civic Center Veteran's Day Concert.**

e. APPOINTED DUTIES

**Operations Division NCOIC; Manager of Mission Sheets process; Unit-level NCOIC of Audio/ Visual products; Chief manager of Social Media.**

## PART IV - PERFORMANCE EVALUATION, PROFESSIONALISM, ATTRIBUTES, AND COMPETENCIES (Rater)

a. APFT Pass/Fail/Profile: ______ Date: ______ b. Height 71 Weight 217 Within Standard? YES

(Comments required for "Failed" APFT, "No" APFT, or "Profile" when it precludes performance of duty, and "No" for Army Weight Standards.)

**o ACFT: NO ACFT - IAW Army Directive 2022-05: "RC (less USAR (AGR)). Evaluations will indicate ACFT status on OERs and NCOERs ending with thru dates of 1 April 2023 or later."**

c. CHARACTER: (Include bullet comments addressing Rated NCO's performance as it relates to adherence to Army Values, Empathy, Warrior Ethos/Service Ethos, and Discipline. Fully supports SHARP, EO, and EEO.)

MET STANDARD [X] DID NOT MEET STANDARD [ ]

COMMENTS:

**o aided a supportive EO and SHARP environment by participation and his own example for junior Soldiers**

**o committed to the Nation and the mission; personified selfless service**

UNCLASSIFIED

| RATED NCO'S NAME *(Last, First, Middle Initial)* | SSN (or DOD ID No.) | THRU DATE |
|---|---|---|
| MORRILL, DAVID, J | 1245311822 | 20221109 |

**PART IV - PERFORMANCE EVALUATION, PROFESSIONALISM, ATTRIBUTES, AND COMPETENCIES** *(Rater)*

| Attribute | FAR EXCEEDED STANDARD | EXCEEDED STANDARD | MET STANDARD | DID NOT MEET STANDARD | COMMENTS |
|---|---|---|---|---|---|
| d. **PRESENCE:** (Military and professional bearing, Fitness, Confidence, Resilience) | ☐ | ☒ | ☐ | ☐ | o maintained physical fitness; encouraged the same standards of others<br>o led new personnel to provide three-hour performance for 89th TC family day with limited notice<br>o displayed composure and confidence under extreme conditions as solo vocalist in high profile ceremonies |
| e. **INTELLECT:** (Mental agility, Sound judgement, Innovation, Interpersonal tact, Expertise) | ☐ | ☒ | ☐ | ☐ | o maintained C1 status as only DMOSQ vocalist in the unit<br>o worked to improve the code on "Mission Sheets" to automate collection of availability, confirmation and tracking of missions<br>o coordinated with the 67th Army Band of WYARNG to execute joint mission honoring veterans of WWII with music of era |
| f. **LEADS:** (Leads others, Builds trust, Extends influence beyond the chain of command, Leads by example, Communicates) | ☐ | ☒ | ☐ | ☐ | o lost 5 of 6 members of his MPT in last year; kept Team functional through borrowing and training all new personnel<br>o as Operations NCOIC, coordinated 26 missions from initial contact to AAR<br>o volunteered for Marshall fire activation; provided care packages for other Soldiers also on the mission |
| g. **DEVELOPS:** (Creates a positive command/workplace environment, Fosters esprit de corps, Prepares self, Develops others, Stewards the profession) | ☐ | ☒ | ☐ | ☐ | o prepared 20 hours of instruction on own time for unit-level Behringer X32 soundboard class, stewarding the profession<br>o passed on knowledge of unit Social Media, website and video production techniques to junior Soldiers<br>o prepared backing tracks for other Soldiers so they could be successful on their Army Music Proficiency Assessment (AMPA) |
| h. **ACHIEVES:** (Gets results) | ☐ | ☐ | ☒ | ☐ | o did not complete Tranining and Evaluation Outline for MPT or Unit AAR over Annual Training as instructed<br>o reviewed and improved all audio/ video products for the unit before being distributed<br>o safely drove unit equipment truck over 1200 miles in support of Annual Training tours |

**RATER OVERALL PERFORMANCE**

i. Select one box representing Rated NCO's overall performance compared to others in the same grade whom you have rated in your career. I currently rate 3 Army NCOs in this grade.

| FAR EXCEEDED STANDARD | EXCEEDED STANDARD | MET STANDARD | DID NOT MEET STANDARD | |
|---|---|---|---|---|
| ☐ | ☒ | ☐ | ☐ | |
| 1 | 2 | 0 | 0 | Total Ratings: 3 |

j. COMMENTS:
o #3 of 3 Sergeants First Class I currently rate; provided valuable service to the unit but experienced problems with higher-echelon officers during the rating period

o always put the mission first

**PART V - SENIOR RATER OVERALL POTENTIAL**

a. I currently senior rate 3 NCOs in this grade.

HQDA SENIOR RATER PROFILE COMPARISON

**HIGHLY QUALIFIED**

RNCO: MORRILL, DAVID, J
SR: MCCALLUM, KELSIE, L
DATE: 2023-01-25
TOTAL RATINGS: 3
RATINGS THIS NCO: 1

b. COMMENTS:
SFC Morrill's technological and musical expertise is invaluable to the unit, and he displays potential for advancement. Of the three Sergeants First Class that I rate, SFC Morrill is number three. Enroll DLC 4 as soon as possible so he can attend MLC.

c. List two successive assignments and one broadening assignment (3-5 years).

Successive Assignment 1) **Training NCOIC** 2) **AMPA Coordinator** Broadening Assignment **EO Leader**

## NJP appeal notification

Devlin, Rory N MAJ USARMY NG COARNG (USA) <rory.n.devlin.mil@army.mil>

Thu 9/7/2023 9:16 AM

To:Morrill, David J SFC USARMY NG COARNG (USA) <david.j.morrill.mil@army.mil>
Cc:Alla, Albana MAJ USARMY NG NGB (USA) <albana.alla.mil@army.mil>

SFC Morrill-

This is to notify you that BG Rogers has considered your appeal and all associated documentation regarding your NJP. After consideration, BG Rogers has elected to deny your appeal. All previous conditions, including suspension of a reduction action, remain in effect until their expiration.

V/R,

Rory N. Devlin
MAJ, JA
Attorney Advisor

(720) 250-1042
Rory.n.devlin.mil@army.mil